# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| MARLA EDWARDS, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. CIV-21-1061-G |
| INTEGRIS HEALTH EDMOND, INC., | ) ) ) |
| Defendant. | ) |

## OPINION AND ORDER

Now before the Court is a Motion for Summary Judgment (Doc. No. 34) filed by Defendant Integris Health Edmond, Inc. Plaintiff Marla Edwards has filed a Response in Opposition (Doc. No. 43), and Defendant has filed a Reply (Doc. No. 44).

On October 1, 2020, Defendant terminated Plaintiff's employment. *See* Def.'s Mot. Ex. 28 (Doc. No. 34-28). On November 1, 2021, Plaintiff initiated this action, alleging claims of race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, race discrimination and retaliation in violation of 42 U.S.C. § 1981, and intentional infliction of emotional distress under Oklahoma common law. *See* Am. Compl. (Doc. No. 20) ¶¶ 22-39; Compl. (Doc. No. 1). Defendant now moves for summary judgment in its favor on each of Plaintiff's claims. *See* Def.'s Mot. (Doc. No. 34) at 25-37. Plaintiff opposes summary judgment on her federal claims but states that she withdraws her state-law claim for intentional infliction of emotional distress. *See* Pl.'s Resp. (Doc. No. 43) at 19-25, 21 n.1.

## I. Standard of Review

Summary judgment is a means of testing in advance of trial whether the available evidence would permit a reasonable jury to find in favor of the party asserting a claim. The Court must grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A party that moves for summary judgment has the burden of showing that the undisputed material facts require judgment as a matter of law in its favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To defeat summary judgment, the nonmovant need not convince the Court that it will prevail at trial, but it must cite sufficient evidence admissible at trial to allow a reasonable jury to find in the nonmovant's favor—i.e., to show that there is a question of material fact that must be resolved by the jury. *See Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). The Court must then determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

Parties may establish the existence or nonexistence of a material disputed fact by:

- citing to "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" in the record; or

- demonstrating "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

Fed. R. Civ. P. 56(c)(1)(A), (B). While the Court views the evidence and the inferences drawn from the record in the light most favorable to the nonmoving party, *see Pepsi-Cola*

*Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005), "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the [nonmovant]." *Liberty Lobby*, 477 U.S. at 252.

## II. Undisputed Material Facts[1]

Defendant is a hospital located in Edmond, Oklahoma. Def.'s Mot. Ex. 1 (Doc. No. 34-1) ¶ 1. Plaintiff, a Black woman and registered nurse, began working for Defendant's Preadmission Testing ("PAT") Department as the department's nurse coordinator in March 2017. *See* Pl.'s Resp. Ex. 3 (Doc. No. 43-3) ¶ 2; Am Compl. ¶ 8; Def.'s Mot. Ex. 1, ¶ 2.[2] The PAT department is responsible for conducting patients' pre-surgical testing. Def.'s Mot. Ex. 1, ¶ 2; Def.'s Mot. Ex. 8 (Doc. No. 34-8) at 57:3-58:1.

At the beginning of her employment with Defendant, Plaintiff acknowledged that she had access to Defendant's workplace policies, agreed to comply with Defendant's Code of Conduct, and participated in a Department Orientation, where she reviewed her department's work rules, reviewed her job description, and discussed how to access Defendant's policies and procedures online. *See* Def.'s Mot. Exs. 5, 6, 7 (Doc. Nos. 34-5, 34-6, 34-7). Relevant here, Defendant maintains a Corrective Action Process ("CAP") Policy that contains a Code of Conduct setting forth the applicable standards of conduct for Defendant's employees. *See* Def.'s Mot. Ex. 3 (Doc. No. 34-3) § 10. The CAP Policy

---

[1] Facts relied upon are uncontroverted or, where genuinely disputed, identified as such and viewed in the light most favorable to Plaintiff.

[2] Plaintiff's position was "at-will." *See* Def.'s Mot. Ex. 4 (Doc. No. 34-4) at 3-4.

3

also contains a progressive disciplinary scheme policy for Defendant's employees, consisting of the following informal and formal steps for disciplinary action:

- Informal Step One: Coaching Session(s);
- Informal Step Two: Counseling Session;
- Formal Step One: Written Reminder; and
- Formal Step Two: Decision-Making Leave.

*See id.* § 3.0. The CAP Policy states that involuntary termination "occurs after all the steps have been taken (if applicable) and the desired change in performance or behavior is not achieved." *Id.* § 4.0.

Between December 22, 2017, and August 30, 2018, Plaintiff received two patient grievances and two patient complaints. *See* Def.'s Mot. Ex. 9 (Doc. No. 34-9); Def.'s Mot. Ex. 10 (Doc. No. 34-10); Def.'s Mot. Ex. 11 (Doc. No. 34-11); Def.'s Mot. Ex. 12 (Doc. No. 34-12).[3] The common theme of the grievances and complaints was that the complaining patients believed Plaintiff to be rude and dismissive. *See* Def.'s Mot. Exs. 9,

---

[3] Plaintiff argues that Defendant's Exhibits 10, 11, 13, and 15—a patient comment report, two memoranda, and an email—are inadmissible hearsay evidence. *See* Pl.'s Resp. at 11-12; Def.'s Mot. Exs. 13, 15 (Doc. Nos. 34-13, 34-15). Defendant contends that each of these documents was contained in Plaintiff's personnel file and is admissible as a business record under Federal Rule of Evidence 803(6). *See* Def.'s Reply (Doc. No. 44) at 4. Alternatively, Defendant argues that the documents, which relate to patient complaints about Plaintiff, are not offered for the truth of the matters asserted but to show the state of mind of Shelly DeSpain, the decisionmaker regarding Plaintiff's termination. *See id.* Plaintiff's hearsay objection is overruled. Without deciding the broader question of whether the documents are admissible as business records, the Court accepts the exhibits as proper Rule 56(c) evidentiary material in that the exhibits would be admissible at trial for at least the limited purpose of evidencing Ms. DeSpain's state of mind in making employment decisions regarding Plaintiff. *See Faulkner v. Super Valu Stores, Inc.*, 3 F.3d 1419, 1435 (10th Cir. 1993) (holding that testimony involving out-of-court statements that was offered to show the employer's state of mind in making its employment decisions was admissible).

10, 11, 12.  Defendant's records indicate that Plaintiff received informal coaching as a result of the grievances.[4]  *See* Def.'s Mot. Ex. 9, at 2-3.

On September 5, 2018, Tammy Stanford, the clinical nurse manager of Defendant's surgical services department, informed Plaintiff that she would be issued a "formal write up"[5] because she had received "2 grievances and 2 additional patient complaints within a week['s] time."  Def.'s Mot. Ex. 13, at 2; *see* Def.'s Mot. Ex. 12, at 2-3.  Plaintiff stated that she would not sign the formal write-up because she did not agree with it.  Def.'s Mot. Ex. 13, at 2; *see* Def.'s Mot. Ex. 13, at 3.

The next month, Shelly DeSpain, Clinical Director of Perioperative Services, became Plaintiff's supervisor.  *See* Def.'s Mot. Ex. 1, ¶¶ 1-3.  Plaintiff, Ms. DeSpain, and Evelyn Radichel, the Administrative Director of Women's and Surgical Services, met and discussed the following: (1) that all patient comments regarding Plaintiff would be discussed between Ms. DeSpain and Plaintiff as opportunities for Plaintiff's improvement; (2) a potential salary increase for Plaintiff; and (3) that Plaintiff would report to Ms. DeSpain moving forward.  *Id.* ¶ 4; Def.'s Mot. Ex. 14 (Doc. No. 34-14) at 2.

On December 20, 2018, Plaintiff received a patient complaint, as well as a report from an Integris employee's father-in-law regarding an interaction with Plaintiff at PAT.  Def.'s Mot. Ex. 15, at 2.  The complaining patient represented that she had a "rather

---

[4] Plaintiff disputes that she received coaching from the Chief Nursing Officer regarding these grievances.  *See* Pl.'s Resp. at 9.

[5] Following the language used by the parties, the Court uses the term "formal write-up" as shorthand for the CAP Policy's "Formal Step One: Written Reminder."

5

unpleasant experience" with Plaintiff, who was "very rude." *Id.* Ms. DeSpain met with Plaintiff to discuss the complaint and coached Plaintiff on her "presentation and patience." *See* Def.'s Mot. Ex. 16 (Doc. No. 34-16) at 2; Def.'s Mot. Ex. 1, ¶ 7. Plaintiff received another patient complaint on July 17, 2019, in which the patient reported that she felt Plaintiff was "non compassionate and unfriendly" during the patient's PAT appointment. Def.'s Mot. Ex. 17 (Doc. No. 34-17) at 2; Def.'s Mot. Ex. 1, ¶ 8. Ms. DeSpain met with Plaintiff about this incident and counseled Plaintiff on her "bedside manner." Def.'s Mot. Ex. 17, at 2; Def.'s Mot. Ex. 1, ¶ 8.

In May 2020, Ms. DeSpain and Ashley Newton, the RN Clinical Nurse Manager for Clinical Services, met with Plaintiff regarding proposed changes to the PAT screening process for elective surgeries. Def.'s Mot. Ex. 18 (Doc. No. 34-18) at 2; Def.'s Mot. Ex. 1, ¶ 9. Ms. DeSpain noted that as they talked through the proposed changes, Plaintiff appeared resistant to changing the previous processes. Def.'s Mot. Ex. 18, at 2; Def.'s Mot. Ex. 1, ¶ 9. Following implementation of the proposed changes, however, Ms. DeSpain came to believe Plaintiff was reverting to old processes. Def.'s Mot. Ex. 18, at 2; Def.'s Mot. Ex. 1, ¶ 9; Def.'s Mot. Ex. 8, at 160:7-162:15. In response, Ms. DeSpain instructed Plaintiff to follow the new processes. Def.'s Mot. Ex. 18, at 2; Def.'s Mot. Ex. 1, ¶ 9.

On June 8, 2020, Plaintiff received another patient complaint, identifying Plaintiff by her first name and stating that Plaintiff was "rude," "demanding," and "tacky." *See* Def.'s Mot. Ex. 20 (Doc. No. 34-20) at 2. Plaintiff disputes ever interacting with this patient. *See* Pl.'s Resp. Ex. 6 (Doc. No. 43-6) at 163:19-164:19. Ms. DeSpain states she

6

met with Plaintiff regarding her demeanor with patients following this complaint. *See* Def.'s Mot. Ex. 1, ¶ 12.

That same month, Aija Springer became Clinical Nurse Supervisor and was responsible for overseeing the PAT department. Def.'s Mot. Ex. 19 (Doc. No. 34-19) ¶¶ 1-2. Additionally, in response to Plaintiff's request for help in the PAT department, Defendant hired Jo Ann "Angy" Engst to fill a newly created PAT RN position. Def.'s Mot. Ex. 1, ¶¶ 10, 11. In late July 2020, Ms. Engst approached Ms. DeSpain and Ms. Springer regarding difficulties in Ms. Engst's working relationship with Plaintiff. *See* Def.'s Mot. Ex. 19, ¶ 2; Def.'s Mot. Ex. 1, ¶ 13. Ms. DeSpain and Ms. Springer state that they met with Plaintiff to discuss Ms. Engst's concerns, but Plaintiff refused to accept responsibility for any of the issues with Ms. Engst. *See* Def.'s Mot. Ex. 19, ¶ 2; Def.'s Mot. Ex. 1, ¶ 13.

On July 29, 2020, Plaintiff was given a "Corrective Action Form" notifying her she was being put on "Decision Making Leave"—the final step prior to termination under Defendant's CAP Policy. Def.'s Mot. Ex. 22 (Doc. No. 34-22), at 2. The stated reason for this disciplinary action was: "Multiple complaints regarding attitude, tone and lack of customer service skills from patients and staff. Insubordination due to not following new processes and procedures put in place by leadership May, June and July. Changing of caregiver assignments on Friday, July 24." *Id.*; Def.'s Mot. Ex. 1, ¶ 14. On or about August 4, 2020, Plaintiff completed an "Employee Action Plan" under the CAP Policy, stating she was committed to the following:

> Open new communication – share this space in a constructive way. Be kind and non-judgmental in my conversation to improve stronger work relationships with my co-workers.
>
> Being open to new ideas for PAT – I will allow my co-workers to discuss new suggestions or improvements for PAT.

Def.'s Mot. Ex. 23 (Doc. No. 34-23) at 3.

The next day, Plaintiff discussed the disciplinary actions taken by Defendant with Ms. DeSpain. Def.'s Mot. Ex. 24 (Doc. No. 34-24) at 2-32. As captured in a recording, Ms. DeSpain in that conversation criticized Plaintiff for not "[a]ccepting any responsibility for any of these episodes or any of these complaints." *Id.* at 6:16-18. Ms. DeSpain further stated that "the last thing" she wanted was for Plaintiff to "go somewhere else or [for Defendant] to have to get rid of" her. *Id*. at 10:3-11:6.[6] Ms. DeSpain stated that the purpose of placing Plaintiff on Decision Making Leave was "100 percent a soft check, like, let's work on, like I said, communication, because that's the whole problem is communication. It's not . . . to term you. I want to coach you up to keep you, not coach you up to term you." *Id.* at 27:9-14.

According to Ms. Springer, Plaintiff in August 2020 refused to implement certain new procedures in the PAT Department regarding patient screening. *See* Def.'s Mot. Ex. 19, ¶¶ 4-5. Plaintiff asserts that she conducted the patient screening "as instructed whenever possible." Pl.'s Resp. Ex. 3, ¶¶ 12-13. Ms. Springer states that in September 2020 Plaintiff and Ms. Engst called and texted Ms. Springer numerous times regarding

---

[6] Regarding Defendant's Exhibit 24, the page numbers cited correspond to the ECF page numbers rather than the transcript page numbers.

their difficulties getting along and working together. Def.'s Mot. Ex. 19, ¶ 8. Ms. Springer mediated these disputes and addressed Plaintiff and Ms. Engst's lack of communication, counseling each at least two times in the month of September. *Id.* ¶¶ 8, 9. According to Ms. Springer, Ms. Engst accepted responsibility for her role in the ongoing issues, but Plaintiff denied contributing to the situation and was unwilling to accept guidance or constructive criticism. *Id.*

On October 1, 2020, Plaintiff sent Ms. DeSpain and Ms. Springer an email complaining of mistakes that Plaintiff believed Ms. Engst was making on patient charts and expressing that the issues with Ms. Engst were ongoing and that Plaintiff's concerns were being ignored. Def.'s Mot. Ex. 26 (Doc. No. 34-26) at 2. Later that same day, Plaintiff met with Ms. DeSpain and Betty Merritt, Organizational Development Specialist in Defendant's Human Resources Department. Def.'s Mot. Ex. 1, ¶ 17. During this meeting, Ms. DeSpain told Plaintiff that she was terminated. Def.'s Mot. Ex. 27 (Doc. No. 34-27) at 3:1-5:23.[7] A Corrective Action Form dated October 1, 2020, stated that Plaintiff was terminated for misconduct in the form of an "[a]ct or omission that creates a material or substantial breach of job duties or responsibilities or obligations." Def.'s Mot. Ex. 28 (Doc. No. 34-28) at 2. The Corrective Action form further stated:

> Continued additional complaints regarding attitude, tone and lack of customer service skills. Insubordination due to not following direction from supervisor regarding appointment schedule of patients.
>
> System HR Policy SYS-HR-122

---

[7] Regarding Defendant's Exhibit 27, the page numbers cited correspond to the ECF page numbers rather than the transcript page numbers.

- 10.1 It is anticipated that all INTEGRIS Health employee[s] will conduct themselves in a professional, businesslike & efficient manner at all times.

- 10.3.1 Breach of internal or external customer service standards, acting in a disrespectful manner to a patient, visitor, family member or co-worker.

- 10.3.10 Productivity and work performance not up to standard.

*Id*.

Ms. Engst, a White woman, was not terminated. *See* Def.'s Mot. Ex. 1, ¶ 19. Ms. Engst instead was given a formal write-up due to her issues with Plaintiff. *Id*.; *see* Def.'s Mot. Ex. 29 (Doc. No. 34-29) at 2-4. Ms. DeSpain later stated that Ms. Engst was not terminated because, unlike Plaintiff, Ms. Engst was not on a Corrective Action Plan on October 1, 2020, the day that the dispute between Plaintiff and Ms. Engst culminated. *See* Def.'s Mot. Ex. 1, ¶ 19.

Plaintiff acknowledges that she never heard Ms. Springer, Ms. DeSpain, or Ms. Merritt make any comments about Plaintiff's race or another person's race. Def.'s Mot. Ex. 8, at 99:1-101:12, 121:20-122:1. Jill Valiant, who also was employed by Defendant, does state that she witnessed Ms. Engst "make racial comments during conversations with [Plaintiff]," characterizing these comments as "uncomfortable and offensive." Pl.'s Resp. Ex. 7 (Doc. No. 43-7) ¶ 10. Plaintiff asserts that she received racist treatment from Defendant's patients and alleges that Defendant never provided support or intervened to combat this treatment. *See* Pl.'s Resp. Ex. 1 (Doc. No. 43-1) ¶ 6; Pl.'s Resp. Ex. 7 (Doc. No. 43-7) ¶ 6. Plaintiff also has provided affidavits from colleagues attesting that they believed that Plaintiff was treated unfairly by Defendant, possibly due to her race, and

affidavits from two Black colleagues attesting that they personally feel that Defendant has treated them unfairly based on their race. Pl.'s Resp. Ex. 1, ¶ 14; Pl.'s Resp. Ex. 7, ¶ 5; Pl.'s Resp. Ex. 13 (Doc. No. 43-13) ¶ 5; Pl.'s Resp. Ex. 12 (Doc. No. 43-12) ¶ 5.

### III. *Discussion*

Defendant moves for summary judgment on Plaintiff's claims for race discrimination and retaliation in violation of Title VII and 42 U.S.C § 1981. The Court considers each claim in turn.

### A. Race Discrimination in Violation of Title VII of the Civil Rights Act of 1964

Title VII forbids an employer from discharging or otherwise discriminating against any individual on the basis of race. 42 U.S.C. § 2000e-2(a)(1). "A plaintiff alleging discrimination on the basis of race may prove intentional discrimination through either direct evidence of discrimination (e.g., oral or written statements on the part of a defendant showing a discriminatory motivation) or indirect (i.e., circumstantial) evidence of discrimination." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225 (10th Cir. 2000); *see also Thompson v. Little Am. Hotel Co.*, No. 22-4006, 2022 WL 10832885, at *5 (10th Cir. Oct. 19, 2022).

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), provides the analytical framework for claims of disparate treatment involving circumstantial evidence of discrimination, as is alleged here.[8] Under this framework, the plaintiff must first establish

---

[8] The parties agree that the *McDonnell Douglas* framework applies. *See* Def.'s Mot. at 25; Pl.'s Resp. at 19.

a prima facie case of discrimination. *See id.* at 802. If the plaintiff satisfies this initial burden, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for its decision. *Id.* Then, if the defendant meets this burden, "summary judgment is warranted unless [the plaintiff] can show there is a genuine issue of material fact as to whether [the defendant's] proffered reasons are pretextual." *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005).

The burden at the prima facie stage is not onerous. *Id.* To establish a prima facie case of race discrimination, a plaintiff must present evidence showing that (1) she belongs to a protected class; (2) she suffered an adverse employment action; and (3) the circumstances surrounding the adverse action give rise to an inference of discrimination. *Ibrahim v. All. for Sustainable Energy, LLC*, 994 F.3d 1193, 1196 (10th Cir. 2021).[9]

The parties do not dispute that Plaintiff belongs to a protected class or that she suffered an adverse action, but Defendant argues that Plaintiff cannot establish that she was terminated under circumstances that give rise to an inference of unlawful discrimination. *See* Def.'s Mot. at 26. Specifically, Defendant contends that Plaintiff can point to no evidence supporting that the ultimate decisionmaker regarding Plaintiff's termination, Ms. DeSpain, harbored any racial animus or that Plaintiff's termination had anything to do with her race. *See id.* Plaintiff argues that her White colleague, Ms. Engst, was allowed to keep

---

[9] The Tenth Circuit has clarified that "[a]lthough the 'articulation of the plaintiff's prima facie test might vary somewhat depending on the context of the claim,' '[t]he critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred under circumstances which give rise to an inference of unlawful discrimination.'" *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 969-70 (10th Cir. 2017) (second alteration in original) (quoting *Kendrick,* 220 F.3d at 1227).

her job despite her involvement in the repeated conflicts between her and Plaintiff, and this fact raises an inference of unlawful discrimination.  *See* Pl.'s Resp. at 21.

The resulting question is whether Ms. Engst was similarly situated to Plaintiff.  "An inference of discrimination can arise from an employer's favoritism toward a similarly situated employee who is not part of the protected class."  *Ibrahim*, 994 F.3d at 1196.  "Employees are similarly situated when they share a supervisor or decision-maker, must follow the same standards, and engage in comparable conduct."  *Id.*

In arguing that Plaintiff and Ms. Engst were similarly situated, Plaintiff focuses on the events on or around October 1, 2020, the day Plaintiff was terminated and Ms. Engst received a formal write-up.  But the record shows that even if Plaintiff's and Ms. Engst's actions during that immediate period present parallel violations of equally applicable standards, Defendant's decision to terminate Plaintiff and discipline Ms. Engst was the product of a series of violations by Plaintiff that had led to her being on a different disciplinary step of Defendant's CAP Policy.  By October 1, 2020, Plaintiff had already been placed on Decision Making Leave, and so the next disciplinary step for Plaintiff under Defendant's CAP Policy was termination.  *See* Def.'s Mot. Ex. 3, §§ 3.0, 4.0; Def.'s Mot. Ex. 28, at 2-3.  Ms. Engst was not on a Corrective Action Plan on October 1, 2020; rather, the next step for Ms. Engst under the progressive disciplinary scheme was a formal write-up, which she was given.  *See* Def.'s Mot. Ex. 3, §§ 3.0, 4.0; Def.'s Mot. Ex. 1, ¶ 19; Def.'s

13

Mot. Ex. 29, at 2-4.  Consequently, a reasonable factfinder could not conclude that Plaintiff and Ms. Engst had engaged in comparable conduct.

Ms. Engst and Plaintiff were therefore not similarly situated, and Ms. Engst is not an appropriate comparator.  Accordingly, even viewing the facts in the light most favorable to Plaintiff as the nonmovant, Defendant's decision to terminate Plaintiff while only giving Ms. Engst a formal write-up does not reasonably raise an inference of unlawful discrimination.

Further, the affidavits of Plaintiff's colleagues stating that they believed that Plaintiff was possibly treated unfairly by Defendant because of her race, *see* Pl.'s Resp. Ex. 1, ¶ 14; Pl.'s Resp. Ex. 7, ¶ 5, are not sufficient evidence to support an inference of discrimination on summary judgment.  *See Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006) ("To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." (internal quotation marks omitted)).  Likewise, the affidavits from Plaintiff's two Black colleagues expressing their personal feelings that they have received unfair treatment because of their race while employed by Defendant do not establish that the circumstances surrounding *Plaintiff's* termination give rise to an inference of unlawful discrimination.

In the absence of evidence supporting that Plaintiff's termination occurred under circumstances giving rise to an inference of unlawful discrimination, Plaintiff has not satisfied her initial burden of establishing a prima facie case of race discrimination under

the *McDonnell Douglas* analytical framework. Consequently, Defendant is entitled to summary judgment on Plaintiff's claim for race discrimination in violation of Title VII.

### B.   Retaliation in Violation of Title VII of the Civil Rights Act of 1964

Title VII's retaliation provision prohibits an employer from discriminating against its employee because she has opposed any practice made unlawful by Title VII. *See* 42 U.S.C. § 2000e-3(a). The burden-shifting framework of *McDonnell Douglas* also guides the analysis of Plaintiff's retaliation claim. *See Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1227 (10th Cir. 2008). To establish a prima facie case of retaliation, Plaintiff must demonstrate (1) that "she engaged in protected opposition" to discrimination, (2) that "she suffered an adverse employment action"; and (3) that "a causal connection" existed between the protected activity and the adverse employment action. *Id.* (internal quotation marks omitted).

Defendant argues that the record does not contain evidence supporting that Plaintiff engaged in protected opposition to discrimination. *See* Def.'s Mot. at 31. To constitute a protected activity, Plaintiff must have opposed a "practice made an unlawful employment practice by Title VII." *Zokari v. Gates*, 561 F.3d 1076, 1081 (10th Cir. 2009) (internal quotation marks omitted). "Although no magic words are required, to qualify as protected opposition the employee must convey to the employer his or her concern that the employer has engaged [in an unlawful practice]." *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008) (addressing what qualifies as protected activity in an age discrimination case); *see also Fye*, 516 F.3d at 1228. Plaintiff argues that she engaged in

protected activity when she made repeated complaints about the racist treatment that she received from patients and from Ms. Engst. *See* Pl.'s Resp. at 24.

While Plaintiff provides the affidavits of her colleagues attesting that they witnessed patients refuse to be treated by Plaintiff, presumably because Plaintiff was Black, *see* Pl.'s Resp. Ex. 1, ¶ 14; Pl.'s Resp. Ex. 7, ¶ 5, it is unclear from the record when, how, and to whom Plaintiff reported this racist treatment.[10] Regardless, the record does not support that there is a causal connection between any of Plaintiff's complaints of racist treatment by patients and Ms. DeSpain's decision to terminate Plaintiff, and Plaintiff does not argue that such a connection exists. *See* Pl.'s Resp. at 24-25.

Regarding Plaintiff's complaints about racist treatment by Ms. Engst, Plaintiff argues that she was terminated on the same day she sent an email to her management addressing Ms. Engst's treatment of her.[11] *See id.* at 25. The email Plaintiff cites does not, however, express that Ms. Engst was mistreating Plaintiff based on her race. *See* Pl.'s Resp. Ex. 8, at 2. Instead, the email recounts ongoing issues in Plaintiff and Ms. Engst's working relationship, specifically stating that Ms. Engst requested that Plaintiff communicate with her on post-it notes when giving Ms. Engst chart corrections because the "tone of [Plaintiff's] voice bother[d] her." *Id.* Even viewing the evidence in the light

---

[10] Plaintiff does make a passing reference to an incident in which a patient hurled a walker at her. *See* Pl.'s Resp. at 17. It is unclear from the record whether this instance of mistreatment by a patient was motivated by Plaintiff's race, but in any event this patient was banned from Defendant's property after Plaintiff reported the incident to the patient's doctor. Def.'s Reply Ex. 1 (Doc. No. 44-1) at 137:19-138:17.

[11] Besides this email, Plaintiff offers no other instance in which she made a complaint to her supervisors that Ms. Engst was mistreating Plaintiff based on her race.

16

most favorable to Plaintiff, in the absence of any reference to race, or to mistreatment based on race, this email cannot constitute protected opposition to discrimination. *See Faragella v. Douglas Cnty. Sch. Dist.*, 411 F. App'x 140, 148-49 (10th Cir. 2011) (finding that complaints by the plaintiff did not constitute protected activity because the complaints did not make "any reference to [the plaintiff's] race, religion, or national origin, or allege[] discrimination or harassment on any unlawful basis").

For these reasons, Plaintiff has not satisfied her initial burden of establishing a prima facie case under the *McDonnell Douglas* analytical framework. Defendant is therefore entitled to summary judgment on Plaintiff's Title VII retaliation claim.

### C. Plaintiff's Claims for Race Discrimination and Retaliation in Violation of 42 U.S.C. § 1981

The *McDonnell Douglas* framework likewise applies when a plaintiff attempts to prove a claim of intentional discrimination in violation of 42 U.S.C. § 1981 through reliance upon circumstantial evidence. *See Kendrick*, 220 F.3d at 1225. As to both disparate-treatment and retaliation claims, the elements of a plaintiff's prima facie case are the same whether the action is brought under § 1981 or Title VII. *See id.* at 1225-26; *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008); *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1211 (10th Cir. 2008). Consequently, because the summary-judgment record does not contain evidence supporting a prima facie case of discrimination or retaliation in violation of Title VII, Defendant is entitled to summary judgment on Plaintiff's claims for race discrimination and retaliation in violation of § 1981 as well.

CONCLUSION

For the reasons explained above, Defendant Integris Health Edmond, Inc.'s Motion for Summary Judgment (Doc. No. 34) is GRANTED. A separate judgment shall be entered.

IT IS SO ORDERED this 7th day of April, 2023.

*Charles B. Goodwin*
CHARLES B. GOODWIN
United States District Judge